## FREEPORT TEXAS CO. v. BOWERS.

District Court, S. D. New York.
March 5, 1934.

424

Douglas, Armitage & McCann, of New York City (Paul Armitage, of New York City, George B. Furman, of Washington, D. C., and Edward Holloway, of New York City, of counsel), for plaintiff.

George Z. Medalie, U. S. Atty. (Leon E. Spencer, Asst. U. S. Atty., of New York City, of counsel), for defendant.

COXE, District Judge.

This is an action to recover $1,260,446.18 alleged to have been illegally collected from the plaintiff as additional income and excess profits taxes for the fiscal year ending November 30, 1918.

The suit is brought by the Freeport Texas Company, parent company of a group of wholly owned subsidiaries, consisting of Freeport Sulphur Company, Freeport Sulphur Transportation Company, Freeport Townsite Company, Freeport Light, Water & Ice Company, Freeport Gas Company, and Freeport Terminal Company; and the amended complaint contains two separate causes of action, one challenging the legality of the entire assessment, and the other asserting that the tax was overpaid to the extent of $347,436.36.

The plaintiff's contention with respect to the first cause of action is that there was no agreement for the assessment of the tax upon the respective affiliated corporations in such proportions as agreed upon among them, as required by section 240 (a) of the Revenue Act of 1918 (40 Stat. 1081), and that, therefore, the tax should have been assessed "on the basis of the net income properly assignable to each," and not entirely against the plaintiff, as was actually done. In the second cause of action, it is insisted that invested capital was undervalued to the extent of $5,354,440.15, and that as a result there was an overassessment of $347,436.36.

The case was tried before a jury of one, and, at the conclusion of the trial, both sides moved for a directed verdict.

On March 15, 1919, the plaintiff, as parent for the affiliated group, filed a tentative return for the fiscal year ending November 30, 1918, showing an estimated tax of $617,478.85, and at the same time delivered to the Collector a check of Freeport Sulphur Company for the full amount of the estimated tax. Then, on June 14, 1919, the plaintiff filed a consolidated return for the entire group, in which the total tax was computed at $696,671.90, or $79,193.05 more than as shown in the earlier tentative return. This additional tax of $79,193.05 was again paid by a check of Freeport Sulphur Company; and, almost simultaneously, information returns on Form 1122 were filed by four of the subsidiaries, showing the proportionate amount of tax to be allocated to each, respectively; and by the remaining two subsidiaries, stating that no part of the tax was to be apportioned to either of them.

Thereafter, in February, 1920, Freeport Sulphur Company, Freeport Sulphur Transportation Company, and Freeport Light, Water & Ice Company filed amended information returns on Revised Form 1122, in which each company answered "None" to the following question of the printed form:

"7. In case of all consolidated returns, the department prefers that the total tax assessed against the affiliated group be paid by the parent company or principal reporting company, instead of being apportioned among the affiliated companies."

"If apportionment is made state the amount of income and profits tax for the taxable year to be assessed against the subsidiary or affiliated company making the return."

These three subsidiaries, together with Freeport Terminal Company, were the only members of the group reporting net income for 1918, and although the record does not contain an amended information return on Revised Form 1122 for Freeport Terminal Company, I think it may be fairly assumed that such an amended return was also filed by that company. But irrespective of whether it was or not, the fact remains that in these

amended information returns the three principal subsidiaries, which for all practical purposes reported the entire income for the group, deliberately reversed their previous statements that the tax was to be apportioned in specified amounts, and advised the Department that no tax at all was to be assessed against any of them; and the other subsidiaries had previously advised the Department to the same effect in the prior information returns filed by them, respectively.

On January 23, 1924, the Commissioner advised the plaintiff in a 30-day letter of a proposed additional assessment of $2,124,-341.89; and in arriving at that figure, the Department estimated the sulphur reserves as of March 1, 1913, at 3,459,000 tons, with a valuation of $7,722,217.50. The plaintiff appealed from this ruling on February 19, 1924, stating specifically that it was the "Taxpayer," and insisting that the March 1, 1913, sulphur valuation was inadequate, and should be increased to $17,220,000. There was, however, no complaint regarding the tonnage estimate of 3,459,000 tons allowed by the Department, which the plaintiff expressly stated to be "acceptable to the Taxpayer." This figure was in fact 459,000 tons greater than the estimate of Messrs. Fisher and Lowrie, plaintiff's own engineers, in their valuation report submitted to the Department with the appeal.

Subsequently, conferences were had between the representatives of the Department and the plaintiff, at which an agreement was apparently reached to the effect that the sulphur reserves, as of March 1, 1913, amounted to 3,459,000 tons, with an estimated life of 17 years, and net profits estimated at $10 per ton. Then on June 23, 1925, the plaintiff was advised by the Commissioner in a second 30-day letter that the sulphur valuation, as of March 1, 1913, had been raised to $13,375,857, invested capital correspondingly increased, and the proposed additional tax reduced to $1,276,728.43. Thereupon the plaintiff filed, on July 16, 1925, a formal protest, in which the "Particular points at issue" to which the "taxpayer" took exception were stated to be three minor items having no relation to the valuation of the sulphur reserves as of March 1, 1913.

Nothing further appears to have been done until February 8, 1926, when the plaintiff wrote the Commissioner, requesting "that the assessment be made immediately," and stating that "Matters of importance with respect to the present apparent surplus of the corporation make it urgent that this contingent liability be definitely stated and disposed of before the next regular meeting of the Directors, which is now imminent." In response to this request, the Commissioner, on February 13, 1926, assessed an additional tax of $1,276,728.43 against the plaintiff; and on February 19, 1926, the plaintiff, by its own check, paid the amount of the tax to the Collector without protest, and without any formal demand from the government. On the same day, the Freeport Sulphur Company reimbursed the plaintiff for the payment, debiting its own surplus in a like amount.

On October 29, 1926, the plaintiff answered a request for further waivers from itself and its subsidiaries, by stating that the additional tax of $1,276,728.43 had been paid in full, "making further waivers unnecessary."

On April 19, 1929, the plaintiff, on behalf of itself and its subsidiaries, filed a claim for refund for $93,990.21, being part of the total tax of $1,973,400.33 for 1918, in which it was stated as follows:

"This refund is claimed on account of an insufficient deduction for depletion and an insufficient amount of invested capital for the year ended November 30, 1918. Supporting data and evidence is being filed with the Commissioner of Internal Revenue, Washington, D. C."

This was followed on April 25, 1929, by the filing of a supporting brief by the plaintiff, which specified only two items as forming the "Basis of Claim for Refund," as follows:

"(a) Depreciation deductions for the year ending November 30, 1918 of the plant and equipment of the Freeport Sulphur Co."

"(b) Reduction of consolidated invested capital for the year ending November 30, 1918 on account of income and profits taxes for the year ending November 30, 1917."

Nothing was discussed in this brief outside of the two items mentioned above, and it was not even suggested that the valuation of the sulphur properties previously made by the Department was in any way erroneous.

On August 15, 1929, a conference was held with respect to the claim, at which the Department and the plaintiff were represented; and Cardwell and Williamson, the Department's conferees, testified that at no time was there any discussion regarding a revaluation of the sulphur properties, or any contention that the tonnage allowance should be increased. This testimony was not contradicted at the trial,

and the conferee for the plaintiff was not even called to give his version of what took place at the conference. Moreover, the conference report signed by the two conferees for the government shows that the only points pressed by the plaintiff were those specifically mentioned in the claim itself and the accompanying brief. The Department suggested, also, the correction of an error made by the government in the computation of invested capital, as appearing in the letter of June 23, 1925. This latter adjustment concerned only the deduction from surplus of $465,259.-34, representing the original cost to the plaintiff of the stock of the Freeport Sulphur Company. It had nothing to do with the sulphur reserves. Subsequently, and on October 22, 1929, the attorneys for the plaintiff wrote the Commissioner, protesting against what was termed "excessive reduction of invested capital"; but there was still no contention that the valuation of the sulphur reserves, as previously allowed by the Department, was inadequate.

On January 28, 1930, the plaintiff filed its claim for refund for $1,276,728.43, in which it was asserted that the entire additional assessment was void, and in violation of section 240 (a) of the Revenue Act of 1918; and on February 17, 1930, an amended claim for the same amount was filed, in which additional grounds were stated as the basis of the claim.

On June 3, 1930, the Commissioner allowed $16,250.25 on the first claim for refund of $93,990.21, but rejected the balance of the claim; and the second claim for refund of $1,276,728.43 was at the same time rejected in toto. The schedules attached to the Commissioner's letter of rejection show that there was deducted from the sulphur valuation of $13,375,857, as of March 1, 1913, the sum of $465,259.34, representing "cost of purchase already included in invested capital"; and this is the "Issue 4" referred to in the body of the letter as follows:

"Issue 4"—Protest against reduction of invested capital for depletion is denied as determined after a conference in the Bureau."

This "Issue 4" was the same "Issue 4" referred to in the earlier conference report, and had nothing whatever to do with any revaluation of the sulphur properties.

The amount of the overpayment of $16,-260.25 was scheduled by the Commissioner on July 7, 1930, and thereafter a check for the amount, with interest, was issued to the plaintiff, and by it indorsed to Freeport Sulphur Company, and paid to that company.

While the two claims for refund were pending and undetermined in the Commissioner's Office, and on April 19, 1930, the plaintiff and its subsidiaries filed with the Commissioner a protest "against the depletion allowance for its Bryan Mound property for 1928 and subsequent years," calling attention to the fact that the "tax payer finds himself in the position of having substantial remaining reserves in the property, and for which there is no depletion allowable for a portion of the year 1928 and subsequent years." The request was then made that additional depletable reserves of 1,626,357 tons be allowed over the previous allowance of 3,-459,000 tons. This protest resulted in a further examination by the Department, and in an exhaustive report made by the Valuation Division of the Mining section, dated June 3, 1931, it was recommended that the tonnage reserves, as of March 1, 1913, be increased from 3,459,000 tons to 5,000,000 tons, and the depletion rate reduced from 3.867 to 3.561.

Following this report, the Commissioner and Freeport Sulphur Company entered into a "Waiver and agreement," dated March 28, 1931, in which it was agreed "that the fair market value, as of March 1, 1913, of the ores in said sulphur deposit, remaining on December 1, 1927, is $5,410,052.35, and that the sulphur reserves, as of December 1, 1927, are 1,793,882.17 tons." There is a recital in the agreement that the Commissioner is unwilling to approve a revaluation if "the said taxpayer would continue to demand or claim any further or other revaluation in the future, or on past returns, such as the now pending 1918 claim for refund on the same or similar grounds."

The plaintiff insists that the agreement required by section 240 (a) of the Revenue Act of 1918 (40 Stat. 1081) is a formal instrument signed by every member of the affiliated group; but there is nothing in the language which requires such a construction. The statute provides that where the tax is assessed upon the basis of a consolidated return, "the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of any such agreement, then on the basis of the net income properly assignable to each." The agreement specified in the statute need not be in any particular form; nor is it stated what the character of the proof necessary to estab-

lish the existence of the agreement shall be. All that is required is that there be an agreement; and this may be shown by any competent evidence, direct or circumstantial, sufficient to prove the fact. That is the construction placed upon the statute by the Board of Tax Appeals in numerous cases; Bermont Oil Co. v. Commissioner, 22 B. T. A. 182, 188; Furniture Exhibition Building Co. v. Commissioner, 24 B. T. A. 1279; Washburn Wire Co. v. Commissioner, 26 B. T. A. 464; Himelhoch v. Commissioner, 26 B. T. A. 541; and I do not think that the language is susceptible of any other interpretation. Nor is Essex Coal Company v. Commissioner (C. C. A.) 39 F.(2d) 892, 894, in conflict with this view; for all that that case decided was that "mere failure to object to the assessment of the whole additional tax against the petitioner cannot be construed as an implied agreement to be so taxed."

In the present case, there is ample proof that an agreement in fact existed for the assessment of the entire tax against the plaintiff. It was the parent company, and owned all of the capital stock of the different subsidiaries; it assumed to speak as the taxpayer for the group in all of the negotiations with the Department. Moreover, the subsidiaries themselves expressly represented to the Department in the information returns that no part of the tax was to be assessed against any of them; and these information returns were just as applicable to the additional assessment as to the payments made when the tentative and consolidated returns were filed. Furthermore, after the proposed additional tax had been reduced to $1,276,728.43, and a formal protest against some minor items had been filed with the Department, the plaintiff wrote the Commissioner on February 8, 1926, requesting "that the assessment be made immediately." Certainly, there can be no doubt that the plaintiff intended by this letter to ask that the tax be assessed against it as parent for the group, and not apportioned among the affiliates, for the letter states as a reason for the request for immediate action that "Matters of importance with respect to the present apparent surplus of the corporation make it urgent that this contingent liability be definitely stated and disposed of." If, as now insisted, the plaintiff was not to be charged with any portion of the additional tax, there could have been no liability to the government, contingent or otherwise, carried on the books of the company.

Formal protest was unnecessary as a prerequisite to suit. Moore Ice Cream Co. v. Rose, 289 U. S. 373, 53 S. Ct. 620, 77 L. Ed. 1265. But after such a request for immediate assessment as contained in the letter of February 8, 1926, the plaintiff is hardly in a position now to assert that there was no agreement among the affiliates as required by section 240 (a) of the Revenue Act of 1918. See Clift & Goodrich v. U. S. (C. C. A.) 56 F.(2d) 751. Besides, the burden of the tax was actually borne by the Freeport Sulphur Company, which was the one subsidiary ultimately liable for its payment. I am clear, therefore, that the plaintiff is not entitled to succeed on the first cause of action.

With respect to the second cause of action, it is the plaintiff's contention that the government admitted in the "Waiver and agreement" of March 28, 1931, that there was "gross error" in the valuation of the sulphur reserves as of March 1, 1913, and that the entire 1918 tax should be recast so to conform to the new valuation agreed upon by the Department. The 1931 revaluation was made, however, in response to a formal protest from the plaintiff and its subsidiaries stating specifically that it related only to "1928 and subsequent years." This protest had nothing whatever to do with any valuation or revaluation of invested capital for the purposes of the 1918 tax. Moreover, the only reason given by the plaintiff for the request that the earlier sulphur valuation should be changed was the realization that there were still "substantial remaining reserves in the property and for which there is no depletion allowable for a portion of the year 1928 and subsequent years." The demand was for the allowance of additional depletable reserves of 1,626,357 tons beyond the previous allowance of 3,459,000 tons. Yet Messrs. Fisher and Lowrie, the plaintiff's own engineers, had stated in a report submitted by the plaintiff to the Department at the time the proposed additional assessment for 1918 was under discussion, that the estimated sulphur reserves as of March 1, 1913, were only 3,000,000 tons; and the plaintiff itself, in its appeal of February 19, 1924, advised the Commissioner that the Department's estimate of 3,459,000 tons was "acceptable to the Taxpayer." In none of the subsequent discussions with the Department, in connection with the assessment, was this tonnage figure questioned, or the March 1, 1913, valuation disputed; so that if, as the plaintiff now contends, the allowance made by the Department for invested capital was

428

inadequate, it was of the plaintiff's own doing, and not something for which the government was in any way responsible.

But regardless of the merits of the claim, the government insists that the claim for refund is insufficient to support the alleged second cause of action. The claim for refund was filed April 19, 1929, for $93,990.21, and states as follows:

"This refund is claimed on account of an insufficient deduction for depletion and an insufficient amount of invested capital for the year ended November 30, 1918. Supporting data and evidence is being filed with the Commissioner of Internal Revenue, Washington, D. C."

The "supporting data and evidence" referred to appears in the brief filed by the plaintiff on April 25, 1929; and this brief makes no mention of any contention that the sulphur valuation as of March 1, 1913, was inadequate. Manifestly, this was not a compliance with the statute requiring the filing of a claim for refund as a prerequisite to the maintenance of a suit, nor did it satisfy Article 1254 of Regulations 74, providing that "all facts relied upon in support of the claim should be clearly set forth in detail under oath." Henry Prentiss & Co. v. U. S. (D. C.) 46 F.(2d) 159, 160; U. S. v. Felt & Tarrant, 283 U. S. 269, 51 S. Ct. 376, 75 L. Ed. 1025.

The plaintiff at no time during the later discussions with the Department either contended or suggested that the sulphur reserves were insufficient, or that the sulphur valuation should be increased; and it is entirely clear from the report of the conference on August 15, 1929, and the Commissioner's letter of June 3, 1930, allowing the claim to the extent of $16,260.25, and rejecting the balance, that the Department never had presented to it for determination, nor considered, any such claim as the plaintiff now seeks to establish in the second cause of action. Moreover, the plaintiff did not request or suggest any amendment to include such a claim. Arthur Solomon v. U. S. (C. C. A.) 57 F.(2d) 150. There is no analogy, therefore, to U. S. v. Memphis Cotton Oil Co., 288 U. S. 62, 53 S. Ct. 278, 77 L. Ed. 619, U. S. v. Factors & Finance Co., 288 U. S. 89, 53 S. Ct. 287, 77 L. Ed. 633, and Bemis Bros. Bag Co. v. U. S., 289 U. S. 28, 53 S. Ct. 454, 77 L. Ed. 1011, recently decided by the Supreme Court. It follows that there can be no recovery under the second cause of action.

The motion of the defendant for a directed verdict is granted, and the complaint dismissed, with costs.